Case No. 24-1745, David L. De Csepel et al, a felon, versus Republic of Hungary, a foreign state et al. Mitch Benedetti for the felons, Mr. Brian for the equity. I should have mentioned it before, but if the podium is uncomfortably high or low for you, there's a button down on your right. Thank you, your honor. From our perspective. Good morning, your honors, may it please the court, I am Alicia Beninati of Cazulitz LLP on behalf of the appellates David De Csepel, Angela Herzog, and Julia Herzog. With me is my co-counsel, Agnes Perestegui, and Mr. David De Csepel and his family are in the courtroom with us today. This is our fourth time before this court on a Rule 12b1 motion to dismiss. The facts are largely undisputed. The 28 artworks at issue in these two interrelated appeals belong to the Herzog family before World War II and were taken from the family during the war as part of a broader campaign of genocide directed against Hungarian Jews. And while defendants boast that the artworks have been in their possession for the last 70 some odd years since the war ended, that only shows the great lengths to which they have gone to avoid returning the art to the family. The question before this court today is whether Mr. De Csepel and his relatives can pursue their claims to these artworks in the United States. In particular, the primary question on both appeals is whether jurisdiction exists under the expropriation exception to the FSIA, 28 U.S.C. 1605 C.3. Back in 2017, this court answered that question affirmatively, holding that a foreign state seizure of property and furtherance of genocide constituted a taking in violation of international law, irrespective of whether the property belonged to citizens of the foreign state. However, in 2021, the Supreme Court held in Federal Republic of Germany v. Phillips that the domestic taking rule applies and forecloses jurisdiction where a foreign state seizes property from its own nationals and that conduct in violation of the international law of genocide is not alone sufficient to overcome the domestic takings rule. Now, the Phillips decision came down a few months before we last appeared before this court for oral argument in the fall of 2021. And as Judge Pillard may recall, Judge Tatel specifically asked defendants counsel at oral argument whether the Phillips court's interpretation of the phrase rights and property taken in violation of international law had any effect on this case. And defendants counsel agreed with Judge Tatel that it was the position of the Hungarian defendants at that time that Phillips was not relevant to the fundamental jurisdiction of the courts here. But as you can see from these appeals, the Hungarian defendants later changed their position following remand. They first moved to dismiss all but one of the remaining artworks based on the domestic takings rule as articulated in Phillips. And then after the district court granted that motion, they then accepted the district court's invitation to also move to dismiss plaintiff's claims to the last remaining artwork, the Santa Barbara sculpture, on various grounds, including subject matter jurisdiction and foreign nonconvenience. I want to start with the domestic takings rule, which defendants have argued forecloses jurisdiction over 27 of the 28 artworks at issue. Basically, all of them except the Santa Barbara sculpture that is the subject of its own separate appeal. And defendants base this argument on the fact that the available documentary evidence, including inventory records, other similar historical lists, contain only Hungarian names and do not specifically identify any German Nazi personnel involved in the takings. Let me ask you just at the threshold as you're getting into the various arguments for German responsibility, I take it in one respect, one of the sort of cleanest and most categorical, least factually granular arguments is that the German occupation of Hungary was itself sufficient to attribute all of the violations of international law to the occupier, thereby displacing the domestic takings bar. That's correct, Your Honor. That is one of the two theories and perhaps the primary one that we've put forward at this point, that the existence of the German occupation of Hungary, which was not an issue in Philip and not addressed by the court there, because that involved different facts, different time periods, different takings, that the fact of occupation lifts this case outside of the purview of the domestic takings rule. What kinds of occupations, only certain occupations? We have a precedent, as you know, the Schubert case, which dealt with the Soviet occupation of Germany post-war. So how do we understand which occupations of a foreign, by a foreign sovereign, would count? Sure, and thank you for bringing up the Schubert decision, because I think that that decision should dispose of defendants' domestic takings argument here. Obviously, Schubert had slightly different facts insofar as it involved the occupation of Germany by the Allied and Soviet authorities at the end of the war. However, there's no dispute, you know, that Hungary was under occupation in 1944 at the time that these artworks were taken. So all the artwork was taken during Germany's wartime occupation of Hungary. Correct. There's no dispute as to the artworks that remain in the case. Not the Santa Barbara. Well, the Santa Barbara is also part of that. The Santa Barbara, which, you know, I will speak to whenever your honors wish, involves slightly different facts insofar as it is the one artwork that defendants have acknowledged there exists at least some evidence of direct German-Nazi involvement, since it was found in a salt mine in Austria at the end of the war. And I will certainly talk about that. But as to the other artworks, there's no dispute that they were all taken in 1944. There's a handful of artworks. I think the focus here is the word occupation.  And it seems like occupations are on a spectrum. They're not all, you know, the Soviet control of East Germany. And where does this fall on the spectrum? And what are the limits? It seems to me that Schubarth made a kind of a sweeping statement where it said that during an occupation, the authority of the legitimate power has, in fact, passed into the hands of the occupant. And that seems to suggest that any occupation would put the occupier on the hook. Well, that language— But that is citing Article 43 of the Hague Convection, which doesn't say that. It says the authority of the legitimate power having, in fact, passed into the hands of the occupant. The latter shall take all measures in his power to restore, et cetera. But what it relies on seems to be if the authority of the legitimate power has, in fact, passed into the hands of the occupant. Then you're on the hook. Schubarth seems to have made it more sweeping than the authority it rests upon would allow. And I'm just wondering, for our purposes—I mean, I think that's dictum. I think that could be corrected. But for our purposes here, how do we look at occupation and decide what occupations count, as Judge Pillard said? Well, I would say first that I don't think there's any dispute that Hungary's invasion and occupation—the Germany's invasion and occupation of Hungary was, you know, subject to the Hague Convention of 1907. This happened—Germany invaded in March of 1944 during the middle of the war. And while Germany— I think she did all power of the Hungarian government passed into the hands of Germany. I think as we set forth in the two expert declarations that we submitted from Dr. Kende and Dr. Kedar, who were both experts in this period of Hungarian history, that while Hungary's government was not entirely displaced, it was effectively a puppet government of Nazi Germany at the time. And that all of the relevant decrees, particularly with respect to the taking of Jewish property— But does that fit the standard that the authority of the legitimate power was in fact passed into the hands of the occupant? I think it does for purposes of assessing who bears responsibility under international law. Broadly for— Didn't Hungary embark on its own campaign against Jews before it was occupied? Yes, but the—as again, as the two declarations explain, those policies changed dramatically when the Germans came into power. Hungary certainly was already mistreating its Jewish citizens as part of its effort to curry favor with Nazi Germany. Unlike many of the other countries in Western Europe who've been the subject of Holocaust claims in United States courts, Hungary ultimately was on the side of Nazi Germany and considered an ally and an enemy by the United States at periods of time. I think a difficulty for you in this case relates to the case where we've given you separate argument time for, which is where Judge Bates held that to the extent that it's a wartime taking by Germany during the war from Jews in Hungary, that the restatement doesn't apply and that it therefore is not a taking in violation of international law within the meaning of the expropriation exception to the Foreign Sovereign Immunities Act. And I know that was not decided in this case by Judge Bates because of the way that the litigation proceeded, but if he's right in the Santa Barbara decision, wouldn't that, by the same token, bar the domestic taking, bar the FSIA claim here as well? Well, if I may, I want to just touch upon a point from the Schubert decision because in terms of drawing a distinction, it is in response to this question. Yes. Well, yes, it would impact these artworks, but I think that, and as I'll get to, that Judge Bates misread Philip in his holding that you cannot have a taking of property that violates both the law of armed conflict as set forth within the hate convention and the law of property. Because, and this is where I'm coming back to Schubert, the Schubert court found that essentially Germany and the Soviet Union both existed as sovereigns during the period of the Soviet occupation at the end of World War II, but that for purposes of the domestic takings rule, the taking of property of German citizens within the occupied Soviet zone basically turned them into aliens for purposes of the domestic takings rule. So it said the domestic takings rule does not apply. The Schubert court did not then take the additional step to determine whether or not the taking of property in that case was also a violation of international law. It said the domestic takings rule doesn't apply here, but we're remanding for the district court to look at the specific facts of this case. Here, that's not necessary because the district court has already had a full factual record. We already know what happened. I still don't see how this answers Judge Pillard's question. Why isn't this a wartime taking? You say, even if, and I think this is how I read your brief, you say that taking can be both a violation of the international law of war and the international law of expropriation, but I guess the narrower question is whether given the limitations in the restatement and given the fact that you rely centrally on the second restatement, and that restatement disclaims that it covers any actions taken, it says we speak only to peacetime. Restatement says that wartime is beyond the scope, but it does not say, and nor does the text of the FSIA, and nor does the legislative history of the FSIA say at any point that a taking cannot violate more than one body of law simultaneously. I understand that that says maybe there's an opening theoretically, but where on the 12v1, the interminable 12v1 litigation, it is your burden to establish jurisdiction. The question is, is there any law you can identify that fills that opening, that occupies the space that your brief says is at least theoretically open? Is there anything that says a taking like this that was in wartime that it could nonetheless be a violation of the international law of expropriation? Yes, because as Congress explained in enacting the FSIA, takings that are arbitrary or discriminatory in nature fall within the purview of the expropriation exception. Those criteria, there's nothing that Congress says that those criteria go away simply because the taking happens during wartime. And if you look at the Ninth Circuit's decision in Altman before the case went up on appeal to the Supreme Court, the Ninth Circuit specifically categorized the Nazi taking of property in those cases as arbitrary and discriminatory and contrary to international law. You also have predating the FSIA. I'm sorry? What source of international law did they rely on in that case? The court was relying on the legislative history of the FSIA and its description of what constitutes a violation of international law. I don't, you know, in that case, they were looking at the fact you had an alien whose property was taken because it was the taking of property belonging to a Czechoslovakian citizen in Austria, which is the same sort of taking that the Supreme Court here in Philip said that the taking of an alien's property during the Nazi era would be sufficient to overcome the domestic takings rule. Now, the defendants will say that Philip occurred at a different point in time, but the United States, both the Supreme Court and Congress and the State Department in some of its statements has never drawn a distinction with respect to, sorry? They never drawn a distinction with respect to? With respect to when during the Nazi period there was actual war and conflict versus the over, they generally lumped the period of time into 1933 to 1945, irrespective of what was going on in a particular country at a particular point. So is it fair to say that because the restatement has this provision that says that this is during wartime, none of these, I guess, provisions will apply to that situation. You have to find sources of international law that is not the restatement to support your claim that this falls under the FSIA. And so you're relying on this Ninth Circuit case and what are the best sources of law that you can rely on that are not the restatement? You also need to look at the Hague Convention itself of 1907. While the Hague Convention may specifically deal with the laws and customs of war on land, that does not mean it does not also address the property. What are your best sources of international law to support that are not the restatement? The Hague Convention of 1907 and the specific articles that say that the taking of private property is forbidden, pillage is forbidden. And I want to be clear, we're not seeking to make a claim under the Hague Convention against Germany. But as this court recognized in Simon, just as... Is that it, just the Hague Convention? Anything else that you're relying on as sources of international law? Of expropriation, I guess that's the international law. Yeah, I mean, I think that we think that the principles informing the restatement are not excluded from their application. It's just because the restatement says that acts that occur during war are beyond the scope does not mean that those same principles articulated in the restatement should not also apply where appropriate. The fact that a taking that... I'm sorry, so you're saying that although the restatement says it's not intended to apply, we should apply it anyway? I think the restatement should still apply anyway, regardless. I'll give you the source of that. It explicitly says that it doesn't. It says it's beyond the scope. I mean, I guess I'm reading a distinction into saying it doesn't say these rules only apply in peacetime. It just says we're not addressing the special circumstances of what also applies during war because the rules may be different. I thought what you were saying was not that you would then rest on the restatement, but that the fact that the restatement says we only speak to peacetime doesn't mean there might be the same substantively, the same rule against expropriation, but just found in another source. But I guess the reason you don't go there is going to be my next question, which is when the Supreme Court in Phillip reversed this court having held that there were genocidal takings and that their genocidal character made them takings in violation or expropriation of international law, the Supreme Court said no. The expropriations that the FSIA exemption is concerned with are expropriations in violation of international law. And by international law, they were speaking more narrowly, not of all the law that's sort of under the umbrella sense of international law, international human rights, the laws of war, and sort of formal international law, meaning law between states, but only the latter. And if that's true, and if the restatement which restates that law doesn't include the Hague Convention protections for private property against pillage and confiscation, then I think we're back with the question whether there are any sources of international law in the narrower sense, in the Phillip sense, that support your client's claim in Hungary under German military occupation. Well, I think, you know, there isn't a primary source of it, you know, apart from the FSIA includes not only the restatement, but it also includes existing treaties to which the U.S. is a party. And I would say that that would include the Hague Convention, which certainly long predated the enactment of the FSIA, and Congress was certainly aware of its provisions. And as we pointed out in our brief, Congress would also have been aware of the 1949 pronouncement by the executive branch that United States courts should not feel any restraint to pass upon the validity of the acts of Nazi officials for the taking of property. I don't think you can fairly cabin, and I don't think Phillip was trying to do this, to cabin property law, international humanitarian law, and the law of war into three separate buckets that can never have intertwining facts. And that was as much as coming back to what this court held in the 2023 Simon decision when it was considering some of these issues in a slightly different context was that this court can still look to the law of genocide and human rights to determine other issues such as nationality of the plaintiff. It does not mean you can never look at it. It just cannot be the primary source for a violation of international law. To accept that position, we would have to reverse Judge Bates in the Santa Barbara case. That's correct. That's correct. So on the questions that you argued about direct and control and about coercion under the RCWA, do you contest the district court's articulation of those standards under Article 1719, or is it really the focus is more on its conclusions, its factual conclusions about whether the evidence shows sufficiently that Germans in fact exercised nation control coercion? I think we made the point in our brief that I think the district court incorrectly framed the issue as purely one of German derivative responsibility for Hungary's actions as opposed to also looking at the fact that as the occupying power, Germany had its own primary responsibilities under the hate convention. So I think they're two interrelated concepts. We don't quarrel with the district court's basic articulation of the RCWA principles. I think they misunderstood. I think the district court misunderstood to a point some of Dr. Kende's opinions that Hungary itself was basically acting as an organ of Germany under the direction and control of Germany. And the district court took the position here, it seems, that unless you have a specific order that says, Hungarian officials, go to this house, take these listed artworks, that you could not have a situation then that's sufficient to satisfy German responsibility for these takings. So is this your de facto state organ theory that Hungary is the state organ of Germany? Or is this your direct German responsibility theory? Or is there a material distinction between the two? I don't think there's a material distinction between those two. OK. And they really flow from the nature of the military occupation. Right. I mean, it's sufficient to make Germany responsible for the taking. Anything more required to be shown in a situation like that? Well, I think it might be a different scenario to reach the threshold. We're not here trying to hold Germany responsible for these takings. There's many other legal issues that come into play there, peace treaties and other agreements. And that's been some of the things that have come up in some of the international cases that we've seen. What we're trying to say here is that it's enough to show that this was outside the bounds of a domestic taking. That this taking was not purely Hungary coming in and taking the property of its own citizens during the war. This was acts that were being done while Hungary was the puppet of another state to, in an in a way that in any conceivable circumstance is precisely the sort of arbitrary and discriminatory taking that the FSIA should be meant to address. And in fact, if you look at the later amendments to the FSIA that have been done. It does have to be a taking by Germany, though. Right. I don't think it does. It has to be, in effect, a taking. Because that's the Schubert case. Is that in Schubert. Back to the question of occupation and what level of occupation counts and how should we look at that, which I don't think is really resolved. But the panel in Schubert found that it didn't matter whether the actual physical taking of the property was performed by German officials or by Soviet officials, because as the supreme power in place. It's a different kind of occupation, right? That's the question. How do we look at occupations? Occupations are on a spectrum. It's an international law report. Well, I think, you know, as we cited in our brief there, the United States recognized Hungary to be an occupied nation when Germany, after following the German invasion. And certainly during the months during which these takings occurred, which was all in the summer of 1944 during the peak of the German occupation. So the difficulty I'm having with is like the RC, where the commentary, for example, to Article 17, that I take the common sense reasoning of what you're saying. You know, there's a Nazi German occupation of Hungary. People who may appear to be doing things, you know, zealously and one might say voluntarily maybe, you know, that may raise an inference that they're doing it without coercion. But the overall circumstances would seem to also potentially support an inference that they're not doing it without coercion. But the RC, what commentary, and I'm looking particularly to Article 17, 6 and 7, and a couple also in Article 18, that they talk about the power to exercise direction and control, and Article 17 is not a sufficient basis for attributing to it any wrongful act of the occupied state. And again, control has to be domination over the commission of the wrongful act, not merely exercise of oversight, influence, or concern. Someone who directs, a state that directs, it's not enough to incite or suggest that they have to actually direct in an operative way. It just seems hard to see evidence of that here. And I recognize that this is threshold, but it also, under the case law, is an evidentiary determination. You know, I know it's difficult with the passage of time and, you know, we're dealing with a historical record here. You know, I think Dr. Kende and Dr. Kadar have explained the historical context in which these regulations arose. But they never say that there was kind of direction of what happened. We do not have an order specifically directing the takings of these specific artworks. So what would be the limit of the standard that you want us to adopt? Because Judge Bates also says in his opinion, you know, most of Europe was occupied by Germany in some sense during this period. Everybody is a... Europe was occupied in different ways and in different times. So I don't think you can generalize necessarily, you know, most other countries that were under German occupation at one point or another in time did not so enthusiastically or at all take the property of their own Jewish citizens to assist and collaborate with the  But what's the legal standard then for occupation? Like, is there a limiting principle? I think it's as set forth in the Hague Convention and, you know... So any country occupied by Germany that takes the possessions of its citizens... If you look at the degree of power, I don't think the Hague Convention says that one sovereign has to have been entirely displaced by another. But where you have a situation here where Germany is basically the puppeteer pulling the strings in Hungary following its invasion... Is that a legal standard? I'm just trying to like get at what is the holding you want from us? Like anytime Germany is the puppeteer, like what are we supposed to say to them? I think when the conditions of a sufficient transfer of control over the state itself pass into, you know... The district court did not dispute that Germany had control over all of the upper echelons of the Hungarian government during the relevant period. It's a question of how far that trickles down. And I don't think the standard should be in a property-taking case such as this, that you have to have a paper trail that connects a German directive signed by a German to the taking of a particular artwork. And in fact, even with Santa Barbara, we don't exactly have that. What is the language in the Hague Convention on which you apply? Bear with me, your honor. So, under Article 43 of the Hague Convention, the convention says, the authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore and ensure  as far as possible public order and safety while respecting unless absolutely prevented the laws enforced in the country. And then further down in Article 46, it goes on to say, family honor and rights, the lives of persons in private property as well as religious convictions and practice must be respected. Private property cannot be confiscated. Now, all right. So, what I'm getting at, as you obviously know, is a point that Judge Piller gave earlier. Namely, there's a lot of evidence here about what Hunger was doing to its Jewish population and what it was requiring its Jewish population to do with its property. And the German occupation came, but it left all of the Hungarian officials in place. And presumably, had they done something that Germany didn't approve of, it would have acted. But that's not the case, is it? I mean, given the evidence of what Hungary was doing, and in particular, with regard to the original collector of all of these properties. So, the decrees that authorized the registration and seizure of Jewish property only came into effect a month after the German invasion. Up until that point, while other things were going on in Hungary, the seizure and taking of Jewish property and artworks specifically was not at issue until after the German occupation. But your whole answer to my question is the order came into effect after the German occupation, which to me is somewhat inconsistent with the argument you're making as to the effect of German occupation. What we're saying is that, and I think Dr. Kendi puts this forward in his declaration, that when Wiesenmayer was appointed to take over in Hungary, it was that everything that happened was supposed to be under his command within the country. And then they come into power, and all of a sudden, all these new laws and decrees start being passed. And I think simply because that was done through the auspices of local or lower-level Hungarian officials does not remove Germany from its responsibility as the occupying force. So let me be clear. This court has not found that declaration persuasive. This issue has not squarely been before any judge other than Judge Bates. In the prior history of this case, this court agreed, dating back years, that— Well, it agreed to the extent of saying evidence could be submitted. All right? But it wasn't saying that the evidence which had been submitted was the decision. There was no— Is that correct? This court found in its 2017 decision—it agreed with the district court at the time—that the taking of the artworks as part of a campaign of genocide that was undertaken by Hungary and its Nazi allies was sufficient. And that was because we did not yet have Phillips' clarification that a taking in the course of genocide was not alone sufficient to overcome the domestic takings rule. The fact of which sovereign performed the taking or which sovereign directed and controlled the taking was never at issue until after Phillips, and to my knowledge, has not come up in— You say at issue, but the evidence was in the record as to who was doing what and who was ordering what, correct? And that hasn't changed. The document discovery was completed—I believe we completed discovery, fact discovery, after the initial determination of jurisdiction under the expropriation exception based on genocide, because the defendants did not contest that the artworks at issue—there were a subset of them that were taken during World War II and never returned to the family. And so the circumstances of that didn't, at that time, bear on the jurisdictional inquiry. And then, you know, even when we were in front of the district court in 2020 on the prior motion to dismiss, jurisdiction had already been established. Jurisdiction did not become an issue again until after the Phillips decision in 2021. And while we briefly appeared in front of this court in October of that year to discuss the appeal of the prior motion to dismiss, the Phillips decision had not yet been inserted and its meanings into this case. I know we've kept you up for a long time. We need a little more time to go. But I just wanted to ask you about the other prong of your effort to establish that the stateless persons, as you argue your clients, were at least in the second restatement. And I wonder whether you have any authoritative materials that you cited or that you'd focus us on that establish that the references in the second restatement to stateless persons applies not only to de jure stateless but also to de facto stateless persons, as you your clients were. We voided that in Simon 3, but I think we'd have to confront that question if we were to take you up on this theory. Yeah. I mean, there is no dispute that plaintiff's predecessors remained at all times de jure Hungarian citizens. We've argued that they were de facto stripped of the rights and privileges of their citizenship by the anti-Semitic measures taken by Hungary during this period. The court does not need to reach the de facto statelessness argument if it agrees that the fact of German occupation takes the case outside of the domestic taking rule. That has the issues of the wartime taking and the confiscation of pillage. In the context of wartime, the remedies might be quite different. And under Philip, it could be that the FSIA doesn't apply. So I'm just looking at this separate question. And maybe you don't really rest on it. In fact, I don't think I saw you taking it up even after the district court mentions this in its opinion at note 20. And then the defendants make the argument in their brief. We did brief the issue as the alternate basis for avoiding the domestic takings rule in the main appeal with respect to the 27 artworks. We understand that the court in Simon had considered the argument and as the district court here had assumed that perhaps the Hungarian claimants in that case could claim de facto statelessness but found that the absence of a remedy under international law was fatal to their claims. Of course, international law was predicated, it's traditionally predicated on the concept of espousal. And we understand that in a framework where one state has to espouse the claims of another, that if you have a stateless person, there is necessarily no state to espouse those claims. But I think the argument that we make here is that the FSIA's expropriation exception and the framework of the exceptions to immunity in general already take these cases slightly outside that traditional framework of international law because you don't need a state to espouse a claim for a private litigant to get jurisdiction under the expropriation exception. If that were not the case, if you go back and look at the Altman decision, the Supreme Court held in that case that the FSIA applied even to takings that occurred prior to its enactment at a time when absolute immunity existed and nobody, including aliens, had a private remedy for a taking of violation, a taking in violation of international law. So the absence of a remedy under traditional sources of international law should not defeat jurisdiction under the FSIA when the text of the FSIA contains no language regarding the requirement of a remedy in this provision. It does in some of the other provisions of the FSIA, 1605 capital A and 1606, when remedies are relevant, they're mentioned. That's not the case here. And I think that, again, we're talking about taking something outside of a purely domestic takings context. Is it here we have Hungary trying to say that, well, these were our citizens, and therefore we could do whatever we wanted. And these are unusual circumstances where you are really not treating these people legally as your citizens anymore. You're treating them as some sort of lesser category of residents in your country. And on the specific point about whether the Second Restatement's discussion about stateless persons applies to de facto stateless as well as the EURA stateless, there's nothing you're aware of that you would want to bring to our attention that confirms? No, Your Honor. Okay. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Aaron Bryan. I'm here with my colleague, Thaddeus Stauber, on behalf of the Hungarian National Gallery and other Hungarian art museums and Hungarian state holding companies. Supreme Court in Philippi, Germany, confirmed the expropriation exception to the Foreign Sovereign Immunity Act requires an underlying violation of the law of expropriation. The Supreme Court further confirmed the law of expropriation incorporates the domestic takings rule. Thus, states taking a property from its own nationals does not give rise to jurisdiction under the Foreign Sovereign Immunity Act. To avoid the domestic takings rule, appellants argue their predecessors were de facto stateless personals and were not Hungarian nationals when Hungary took the artworks at issue here. This court in Simon v. Hungary considered the same argument and held that although Philippi does not foreclose such a theory, the claimant must provide sources of positive international law showing this theory has crystallized into an international norm. With the benefit of this court's decision in Simon, the district court below requested supplemental briefing on that very question, inviting the appellants to provide sources of international law to support their theory. The district court found appellants did not provide any such source of international law. And in fact, the appellees, the defendants, the district court level provided multiple sources of international law showing that a state's taking a property from a de facto stateless person does not violate the law of expropriation. That decision was well founded. It's supported by numerous sites to sources of international law and should be affirmed. This court should also affirm the district court's well-reasoned rejection of petitioner's secondary argument, which pivots from holding Hungary responsible and instead argues that Germany is in fact responsible for Hungary's taking of the artworks. Even if this theory was a viable method for establishing jurisdiction under the expropriation exception, Judge Bates' detailed actual findings confirm that Germany is not responsible for these takings under international law. What's different about this case from Simon and some of the others that have percolated to the courts is the party's completed fact discovery before the briefing on this issue. Judge Bates had a fully developed factual record, had volumes of evidence and source documents to consider, and his detailed findings based on that record is that Germany did not direct, control, or coerce Hungary's takings of the artworks. At the occupation point and our decision in Schubarth, finding that occupation of Germany by the EU was in fact enough to vitiate the domestic takings part. In the post-war situation in Germany, as we've seen, Judge Bates considered this decision, considered that case, and found it important that Germany's statehood had effectively been abolished, that the Soviets, Russia, was the supreme organ of power in place at the time, and that the German authorities that were newly created could only act as auxiliaries of Soviet power. There's no evidence supporting any finding like that in this case. There's evidence of influence, there's perhaps evidence of cooperation, there's evidence of perhaps aligned ideologies, but there is no evidence that when Germany came into Hungary, it occupied Hungary in that manner or that method or to that degree. And Judge Bates' detailed findings on the specific takings in question here show that there's not even evidence that Germany was involved in these takings. And so the idea that they could have supreme power over the entirety of Hungary, such that they are the responsible party for everything that takes place in Hungary, there's no evidence to support that finding. And Judge Bates correctly found that mere occupation, even understanding there's degrees of occupation perhaps, alone does not, under international law, make Germany responsible for these takings. If you look at- What's the source for the standard that you articulate, which is Germany would have to direct, control, or coerce the taking? That's a combination of Article 17 and 18 of our CIWA. Article 18 talks about coercion. Article 17 talks about direction and control. And it is more than influence, it is more than incitement, it is more than assistance. It is an operative direction of the particular act in question. So here would be the takings of these 27 artworks and then separately the And so what Judge Bates did was formulate a test for what could make Germany responsible under these derived theories of responsibility and found that there's just no evidence that rises to that level. Deal with the fact that Hungary- I mean, part of the reason for the German occupation and the historical record and the record in this case are clear. Part of the reason was they didn't think that Hungary was dealing harshly enough with its Jews. And when Germany occupied Hungary, they really accelerated things precisely like the harms that are complained of in this case, the expropriation of property, the systemic efforts to eliminate their culture and the people themselves. So if the aim of the German occupation here was to subjugate the Jews and bring about things like these takings, it's a little bit hard to square that with a kind of general claim that the level of control was not enough. I don't know that there's evidence that that was the primary reason for their- Oh, so if it's just a substantial reason but not the- No, no, no. But I'm saying there were issues with the Soviet army coming from the east, so it wasn't merely to come into Hungary for this particular purpose. So that was my- But none of these actions was contrary to German policy when it was in charge of- Correct. Correct. Well, with one exception in the record regarding artwork that was taken from one of the Herzog family's palaces, there were German troops stationed at that location that tried to interfere with the Hungarians removing artwork and there were arguments that took place about how and what could be taken. So it was not entirely 100% cooperative, but yes, it was in line with what the German forces were also. So does that, the primary factual event that you point to to show that Hungarian officials did have some degree, retained some degree of practical agency under the German occupation? That's one piece of evidence that exists in the record. There's also a lack of evidence of any German control or direction or authority over this conduct. These were carried- Over these specific things. But pretty close to the extent that Germany came in in order to accelerate the taking of things of value from the Jews and to subjugate and exterminate the Jews. And they put leadership in Hungary that would effectuate that. They drafted policies that authorized these takings. And the Nazis kept very detailed records, but you might have just a policy and people carrying it out. That's not enough under a CWO? No, it's not under either 17 or 18. They require, 18 requires a total, as if the state could not have done it without the coercion of the coercer. And if it's a policy, if it's a general policy that squarely applies, isn't that granular enough? Under a CWO, no. Under a CWO incitement even? Incitement is different. Incitement might be somebody giving a speech, but if you had a policy that said, Hungarian government under our control, go and find all these things and do this and this, the fact that it's written in general terms, but directed to the exact fact scenario, that's not enough? I don't think there's evidence in the record. So any taking that would operate through a general, an edict, an authoritative and enforceable edict, but that would be written in general terms would not be enough? When I read our CWO, I think that might be. When I read our CWO, and as Judge Bates formulated the test for this case, is whether there is evidence that Germany, the state to be held derivatively responsible for Hungary's taking, actively directed or controlled that taking. So one artwork at a time, not a general statement, not a general edict, but specifically, did they force that conduct to occur? But they don't make this general particular distinction that you're talking about. I think you're right that the distinction is incitement or suggestion is not enough. You have to have actual direction, but nothing in the commentary that, as I read it, prevents the actual direction of an operative crime from being more general than your briefing and your argument suggests. And you can help. Yeah. Nothing less than conduct which forces the will of the coerced state will suffice. Right. And that's in the coercion. I'm looking at direction and control and where it talks about dominion over the commission, domination over the commission of wrongful conduct, not just oversight. So if somebody comes in, authoritative leader, and says, you will do this any time you are dealing with a Jewish household and search for all the things of value and take them and take them to this place. I mean, the fact that it would be written in that way, to me, does not fall short because I'm talking about direction. And if you think about how military leaders direct their troops, they don't tend to say, and then when you turn left and you find this person, you shoot them. The direction tends to be, you know, in this category of encounter, you do X, that category of encounter, you do Y. And that is direction. Oversight. Well, okay. I take your point, but what we didn't find is any evidence of that. What we found and what was produced in the factual record and what Judge were doing, this was done by Hungarians pursuant to Hungarian legislation, the artworks were moved to Hungarian museums, and then by Hungarian troops taken out of the country. This was not an operation that was directed, forced, or coerced by the Germans. Whether there was an alignment of thoughts or not, there just was no evidence that Germany was telling Hungary to do this, directing Hungary to do this. Recall to me, what was the evidence about the SS troops? The SS troops, it comes into play with the Santa Barbara sculpture. And that's the only place? Correct.  Go on to your argument. Is that enough? Following up, including anybody? Yeah, let me, there was the question of international law and whether a violation of the law of war is sufficient for a violation of expropriation. There is sources of international law that say that is not enough, that they are not the same. And there's an ICJ arbitration decision, Germany versus Italy, that's cited by the Supreme Court in Philip. The Supreme Court focused on language where the court said, a state does not lose its immunity by violating the laws of human rights. That quote continues, the Supreme Court cut it there, but as Judge Bates noted, that quote continues, or the law of war. So that's one source of international law where you find that the law of war is treated differently than the law of expropriation for whether or not we have a violation of the law of expropriation. There were cases from the 19th century, the bombardment of Valparaiso, we're going back in time, but in that situation, the belligerent, Spain, was found to be subject to the law of war. The host nation, Chile, that was bombed, was found to be subject to the law of expropriation. So you've got this separate tracks developed for separate reasons. And what I heard from- I'm sorry, what was the name of the- The bombardment of Valparaiso. And where is that? It's cited in our papers. And then a separate but similar, same time frame, same kind of issue, deals with the independent free state of Greytown, which is near Nicaragua. In that situation, it was our forces that were bombing and causing damage to Greytown. French residents, French nationals, made stink about it. And our Secretary of State said, they have no claim here. There is no violation of the law of expropriation here. This was done within the context of war. And so there's- So it's war-related remedies that you deal with that through treaties, through claims tribunals, and the like. It's war-related- After a conflict. Correct. But it also is a reminder that under Philip, what we are talking about is whether there is a violation of the law of expropriation. So back into the second restatement, there is this reference in the second restatement to aliens, and aliens include stateless persons. What are we supposed to do with that? Well, the restatement did some of it for us by the time the third version came out. They rewrote- The second restatement is what is considered authoritative with respect to the FSIA. Correct. Changes in language, though, have also been deemed important by this court in Helmreich when they were looking at a difference between language and examples in commentary between the second and the restatement. The fact that it was removed between those two revisions was significant. Here, you had a redefinition. The term alien was replaced with national of a foreign state. And in the commentary, I believe it's commentary D, where it starts with stateless, it says specifically there is no protection under these rules for someone who is stateless, who does not have a national state. And so I understand that there was some ambiguity because of how 185 and 171 were written. That was discussed by this court in Simon. That's not a novel argument, but the fact that there is no source of international law that supports the theory, even if it's viable, there is no source of international law that supports the theory that taking property from a de facto stateless person is a violation of the law of expropriation. So we end up back where this court was in Simon, which is a viable theory. And arguably under the derived responsibility of Germany, it could be a viable theory, but the evidence does not exist to support it. Now, how about in the, I mean, just conceptually, we have, I think, you know, one of the powerful supports for your position is that because international law is state to state, and, you know, the state is subject to violation, when you have stateless persons, it's a tough hit to even find the rights, let alone remedies. But the third restatement does separate harms from remedies to some extent, if you compare section 712, state responsibility for economic injuries, and then 713, remedies. And if the, if the body or the restatement of this body of law itself recognizes the difference between harms and remedies, why not in the situation where you have aliens, stateless persons who are harmed, they might not have an espousal remedy, but as counsel for the plaintiffs would think, as an Altman, you know, the court has in some instances recognized that the FSIA could provide a remedy, even where international law is subject. I think that, as this court discussed inside, the fact that a stateless person may not have a remedy, may or may not preclude that this is a violation of international law, but again, we go back to whether there is a source that supports that. And so we're left again with a viable theory, perhaps it's supported, but there's no actual source of international law that says that is the case. In fact, everything on this point goes in the opposite direction. Whether you look at arbitration decisions, the UN study from 1949, the more recent monographs that talk about stateless persons and what rights they do have, they certainly have rights under other laws and other systems. But as it relates to the law of expropriation, which as you know, is state to state, and that's how it has historically developed, there is no protection for stateless persons. Thank you. Did counsel reserve rebuttal time? You don't have to take the whole five minutes. In fact, I mean, you could go ahead and do rebuttal. It feels a little bit artificial to have two separate arguments, so go ahead and do rebuttal and then we'll let you stay up and start the next part. Okay. I wasn't sure if you're, to what extent your honors wanted to hear more on the takings point with respect to the Santa Barbara sculpture in particular. I'm happy to move into that and to fold any other arguments that I would have into the argument of that appeal, if it is easiest to do that. I think we've already touched upon some of the issues already with respect to whether a taking that occurs during wartime falls within the expropriation exception to the FSIA, and that is squarely at issue in the Santa Barbara appeal, because that sculpture was found in a salt mine in Austria after the war, and a contemporaneous interview by the mayor of the town said it was brought to the salt mine by German SS units. And, you know, we submit that sufficient to meet our burden to show at least some evidence of direct Nazi German involvement in the taking of that sculpture. And defendant's primary argument in the court below was that they thought that the Supreme Court was going to shift the burden when it heard the Simon appeal, and that it was going to put the burden on the plaintiffs to prove sovereign immunity rather than keeping it as it has been that we have a burden of producing evidence, but the sovereign bears the ultimate burden of persuasion on sovereign immunity. Despite some commentary at oral argument, the Supreme Court did not change the burden in the Simon decision, and it remains as has always been articulated in prior decisions of this court. As I touched upon before, while Philip held that a violation of the laws of human rights alone cannot supply the basis for abrogating sovereign immunity, it did not hold that you can never have a taking just because the conducted issue may violate more than one body of law. And this court recognized that in Simon when it held that Philip, that this court could still consider the fact of the takings having occurred during a period of genocide in Hungary as part of considering whether there were facts that would come to bear with respect to aliens in Hungary as to the wartime takings in that case. I don't know to what extent your honors have additional questions on the takings or if you'd like me to address the forum nonconvenience issue that was the district court's alternative basis for dismissing the Santa Barbara sculpture. That forum nonconvenience dismissal was predicated on the court's prior dismissal of the claims to the other 27 artworks. I guess just before you move on to forum nonconvenience, you've argued that the ICJ opinion that is cited favorably in Philip was only being used to distinguish international human rights law, but doesn't the same sentence talk about international human rights law and the law of armed conflict as not the law that the FSIA is referencing when it talks about expropriation violation of international law? It's talking about how a violation of these other buckets of law cannot provide the exclusive basis for holding a sovereign liable under international law, but the issues here are different. We're talking about jurisdiction, not liability. We're talking about the facts that you can look at to determine... How does that make a difference, jurisdiction rather than liability? It's not such a clear distinction, at least on this issue. Because you need to show simply for purposes of the FSIA that there has been a taking in violation of international law. You don't need to be suing the sovereign that performed the taking. You can prove the extent of damages and those kinds of things at a merits hearing, but you do have to show that it's a kind of action, the kind of tort, if you will, that is cognizable. Congress, when it enacted the FSIA in its legislative history, specifically referred to takings that are not only without proper compensation, but that are arbitrary or discriminatory in nature. This is consistent with the State Department's position in 1949 that Nazi takings were outside the boundaries of active state concerns because U.S. courts were free to pass upon the validity of the Nazi officials in evaluating these sort of discriminatory and uncompensated takings. Didn't the court in Philip already talk about that that doesn't support an FSIA sovereign immunity waiver? We're not arguing a waiver of sovereign immunity here. Sovereign immunity abrogation by Congress. I mean, the FSIA authorizing suits where sovereign would otherwise be immune. Philip, I thought, distinguished those as, and so they're not basis for us to read the FSIA as allowing suits on this ground. Philip was not, Philip was focused on whether conduct that violates the laws of genocide takes the case outside the domestic takings rule. And it did not have, the Supreme Court did not address the impact of any other body of law or discuss whether or not you can expressly discuss whether or not a violation can be both. However, the Supreme Court left the door open that the taking of an alien's property during the Nazi era would be outside the domestic takings rule. And it remanded the case for the court to find out if the Philip plaintiffs had adequately preserved their argument on nationality, et cetera. But that remand would not have been necessary if the court thought that these two bodies of law were entirely exclusive. That even if you have an alien whose property is taken, well, if it's really a violation of human rights law, you can't bring a property claim. Similarly, in Simon, it would be unnecessary for this court to have found that the handful of plaintiffs who were able to establish that they did not have Hungarian nationality at the time of the wartime takings could continue to pursue their claims if wartime takings under any circumstances are outside the boundaries of the expropriation exception. If a taking is uncompensated and arbitrary and discriminatory and would otherwise meet all of the criteria for taking in violation of international law, it simply defies logic to say that just because that taking happened during a period where there's also a war going on, takes it outside the boundaries. And if you look at the plain text of the SSIA itself, whenever Congress has had occasion, as they did in amending section 1605H to cover certain exemptions for art displays in the United States, they did not distinguish between the Nazi period when it involved active war versus simply the years 1933 to 1945. It has always been the position of the United States government that these claims are discriminatory and wrongful. And the fact that they occurred in a period of active war or not, should not remove an otherwise actionable claim from the scope of the expropriation exception. There's simply nothing in the language that supports that. Turning back to form nonconvenience, as I said, the court based its dismissal of the claims on the fact that the other 27 artworks had already been dismissed. So if this court finds that that decision was improper and that the other 27 artworks come back in, the basis for district court's form nonconvenience dismissal largely falls away. We had addressed form nonconvenience at the very outset of this case on the first motion to dismiss back in 2011, and this court's first appeal back in 2013, when everyone found that these claims should stay here in the United States. And it was only after the court dismissed the bulk of the artworks, and we were down to one sculpture owned by the two Italian plaintiffs, that the court found that that was sufficient to change the analysis. We respectfully agree. We think the court wrongly shifted the burden to the plaintiffs to prove that the United States was the better forum, rather than keeping it the burden on the defendants as it should be to show that this action is really more appropriate in Hungary. A foreign plaintiff is still entitled to a strong presumption in favor of its choice of forum. But this part held that you didn't contest that Hungary was an adequate alternative forum? I don't think that's a fair reading of our papers. I know that's what the district court said, but, and this came up particularly in the context of, you know, the exhaustion argument. We had consistently argued that while Hungary may provide a judicial forum that is capable of hearing certain claims, that pursuing further litigation in Hungary would have been futile. The family tried for a good decade or more before they ever brought claims here in the United States to pursue certain claims to artworks in Hungary. And along the course of this very lengthy appeal, there was a period of time where Hungary had set up a new special procedure that was supposed to make it simpler for claimants to adjudicate art claims in Hungary and change the balance of decision-making a little bit. That was instituted during the course of this case and fairly promptly repealed. It no longer exists. So I think, I'm not sure the district court appreciated all of those nuances because, you know, by the time we were re-litigating this, it was at a different stage after many decisions had already found that the plaintiff should not be required to litigate further in Hungary. We had had prior motion practice in front of Judge Huvel, who retired in the middle of this case, you know, with expert declarations and all of that on why the procedures in Hungary were inadequate. What remedies would there be? I'm sorry? What remedies might there be? So my understanding is that, you know, a claimant can go to the Hungarian courts and file a lawsuit and that the Hungarian government entities are not immune from suit, but the Hungarian courts have already made it clear that cases of this nature, you know, there has yet to really be a successful Jewish restitution case in Hungary. Doctrines such as, you know, adverse possession come into play where the fact they've held, you know, these artworks for as long as they have is enough and other issues. So... And there's no letter form like the international court or something like that? Well, defendants have not argued that this case belongs anywhere else than Hungary. And I want to know... I'm just wondering, I'm just wondering if there will be for these plaintiffs if not here? No, I don't think there is, Your Honor. Not at this point. And the two Italian plaintiffs who own the Santa Barbara sculpture are of a very advanced age. One is in her 90s, the other one, I believe, late 80s. You know, they are the daughters of Andras Herzog, who originally owned the sculpture and was sent to the Russian front and killed during World War II. So they are of quite an advanced age. And the only person for whom a Hungarian forum would be more convenient is the defendants themselves. I mean, their counsel is here. They are in Italy, not Hungary. Fact discovery has already been completed here in the United States. There's simply no reason to turn, you know, the case over whether it's one artwork or 28 artworks back over to the Hungarian courts when, you know, there's no evidence that... Do you have a sense of how much these paintings or these artworks are worth? In our complaint, you know, when we started out with the 44, we had alleged that they are worth in excess of $100 million. The 28 that are left in one form or another between these two appeals still have a very substantial value. If we were down to the one sculpture, I don't think I could put a value on that. It's been a long time since an appraisal was done. And, you know, obviously, the one is worth less than the 28 together. But some of the artworks that remain in the case are among the most valuable. I have a single piece of art that I noticed just this morning, a reference to the piece in the studio, that it was on deposit with Hungary. Yes. Even though I think Hungary thinks that its ownership transfers transferred to it half a century ago. Can you just clarify what the status is of that? So Hungary maintains, as we established in Discovery, they maintain two separate inventories for artworks that are held in their state-owned museum. Could I just be clear before we go back to that? Because there are two other pieces of art. One of them is in the studio, the other is in the museum. And those judge base made findings. I'm sorry, I couldn't hear you. Judge base made findings on those two other pieces of art. He did. He did. In the first case. Yes. I just want to be clear in the sculpture case, what is the status of the litigation? Where are you? Any discovery through Discovery? Yes, the Santa Barbara sculpture was part of Fact Discovery along with all of the other artworks. So what's left to be done to resolve the case? So if the cases are remanded to the district court, the parties have reserved rights on expert discovery. So there may be some expert, you know, potentially, yeah, there's still expert discovery and summary judgment and, you know, discovery into valuation or into the merits, which would include, you know, I don't know to what extent we would need it on the merits, certainly to the value of the artworks. But we've remained at a rule 12 stage for 15 years. So we have not yet, there's been a handful of motions for summary judgment on discrete issues that have been denied, you know, in the context of the Santa Barbara case, the statute of limitations motion was denied, but there hasn't. I'm just trying to understand, you know, 15 years so it's filing a complaint that satisfies the district court. That's not where you are. No, because in this case, because we've had so many Rule 12b1 motions because of Hungary's sovereign status and their ability to bring an interlocutory appeal every time they lose on the question of jurisdiction, the first time they lost on the question of jurisdiction and the court sustained jurisdiction, the parties all agreed to proceed with Fact Discovery. So we did, you know, there's been a complete document production with respect to all of the artworks. There were depositions of Hungarian personnel and of one of the plaintiffs back in, I want to say it was 2018. You'll forgive me if my memory's a little fuzzy on exactly which year, but it's been a while. And it was certainly before both the 2020 round of motion practice in the district court and this most recent 2024 round in front of Judge Bates. So there's no dispute at this point as to what the facts are. And so these two cases before us would proceed as two separate cases in the district court? No, it's all one case. What happened here, Your Honor, is that, yeah, the defendants had moved to dismiss only the 27th. Okay. So you had asked me about in the studio. And you had started to say that there were, that the Hungarians maintained two separate inventories. Right. So there is an inventory of state owned artworks. And then there's what's called the deposit inventory. And when we did discovery, the testimony of the Hungarian witnesses was generally that artworks that are on the deposit inventory are considered not to be state property. And I think that's fairly typical with museums of this nature, that they have their core collection that they believe to be state owned. And then there are other artworks that are placed with them on deposit for one reason or another, by private parties. And so in the studio, as of the time that Mr. de Cheppel's aunt, Martha Nirenberg started negotiations with the Hungarians in the late 90s, was still on the museum's deposit inventory. And there, I mean, this is outside the record of these appeals, it was an issue on some of the prior motions, there were minutes of meetings with an expert committee that Hungary had formed, in which, you know, a representative of the museums agreed, at least at that time, that it appeared that that artwork was not state property. Obviously, defendants have taken a different position in this case, that notwithstanding the fact that the artwork, as I understand it to this day, remains on the deposit inventory, along with, I may add, some of the other artworks in the case. It's not the only one. But there's been, you know, legal reasons for why different artworks have come and gone out of this case. But, you know, our argument was that there was, with respect to this sculpture in this most recent decision in front of Judge Bates, was that there was no reason for the district court to reopen and accept defendants' footnote argument that it should reconsider jurisdiction over these two artworks, when there'd been no change in the facts of the law with respect to those, and they were taking advantage of the fact they had a different judge. Only as to the Zitterbarth piece, not as to in the studio. But it was not new evidence in the sense of evidence that wasn't available to them at the time of the original motion. It was just the court had not seen it before. The court had not, but Judge Bates hadn't seen any of it before because he had... No district court had seen it before. That's correct. Judge Chevelle had not seen that particular document. Yes. So it was new evidence in that sense. In that sense, yes. Then, as to in the studio, what's your argument? I understand your first argument, the district court never should have gone into this again, but he did, so now we're into it. So what is your response and argument as to why he... The argument is that the facts are, as before, show that there's no evidence that this artwork was taken prior to the entry of the 1973 agreement between the United States and Hungary. And so if it was taken into state ownership at all, it was taken after that agreement was executed at a period of time when its owner was indisputably a United States citizen. And because it post-dated the 1973 agreement, should not have been treated as a taking covered by that agreement and would as a taking, if it occurred sometime post-December 1973, be something that could squarely give rise to jurisdiction under the expropriation exception, as a taking of property by Hungary that belonged to a United States citizen. So what is your understanding when the district court said that Chevelle's is legal? My understanding of? The district court judge base statement that the evidence on which Judge Chevelle has the law is legal. I think he just took a different view of the same evidence. He wasn't looking at anything different, just a different interpretation of the same document. Well, he referred, does he not, to, and I don't remember the person's name, but it's one of the surviving sister's claims that was filed. And he refers to a lawsuit in Hungary. That's the Nuremberg lawsuit that I was mentioning before that occurred in the late 90s. Yes, the artwork was part of the negotiations going into that lawsuit. But I don't think he was looking at a different set of facts than what Judge Chevelle had considered on the prior motion. Thank you, Your Honor. Thank you. I'll pick up with the last two artworks that were just being discussed, unless you have another area you'd like to start with. The district court judge Bates acknowledged in his decision that he was reexamining the evidence and found that this was a timing issue, whether or not these artworks were taken when Erzsébet was an American citizen or still Hungarian, and on the other artwork, whether it was taken when the two sisters were still Hungarian or had relocated and become Italian nationals. What he found is that the evidence showed in 1959, prior to the 1973 settlement agreement with the U.S., Erzsébet had made a claim for this particular artwork. This provided support for the finding, this factual finding, that it predated the settlement agreement and thus would have been resolved by the settlement agreement. It being the taking. Yeah, it being the taking. She was already claiming it in 1959 as having been taken from her, so it would have been resolved by the 1973 settlement agreement, or at least would have been taken prior to that. What I'm trying to understand, though, is if she was mistaken about that, how could she have recovered a claim? If she was mistaken about... If she was mistaken that it had not yet actually been taken? What we know from the record is that she was claiming it in 1959 as having been taken. And so, Judge Bates... You file a claim, the property of mine was taken, and the authority says, we've looked at this, you're wrong. It was never taken. So, you don't recover anything. I'm just trying to understand the weight that is properly given to this evidence that Judge Bates relied on. He says there was a claim, he says there was a case in Hungary. No, sorry. This was a claim that was submitted to be resolved as part of a settlement agreement between Hungary and American citizens. And so, the claim was not necessarily made to Hungary to respond or deny. So, it was part of a process... That's because you submit a claim, you automatically proceed. That's all I'm trying to say. I don't know if you actually succeed or not. The question is timing. She's not privy to where exactly and under what terms the artwork is being held. So, I think all Judge Rogers is saying is if she has some reason to believe that it might have at that point been owned by Hungary, then she would file a claim, kind of a protective claim, and if it is, then I can get it. If it's not, then I might not. But the existence of a claim by someone who isn't in a position necessarily to know all the facts at the particular time isn't dispositive of the actual ownership or status of the art at that time. I mean, I'm just trying to... Yeah. No, I understand the distinction. What Judge Bates was trying to do, at least, as he's explained in his decision, is looking at the evidence. I understand that. All I'm saying is, is the weight that he gave the evidence reasonable or was it clearly alluding? I don't believe... It's all a claim, and somebody else filed the lawsuit. That's all I'm asking. He doesn't say anything. He just let it be that fact. Claim was filed. There was a lawsuit in Hungary. My only question. As to the other artwork, similarly, he was looking at whether or not that had been taken based on the factual record before or after the two Herzog sisters had become Italian nationals. He found that based on the facts and his review of those facts, it took place while they were still Hungarian, so it's barred by the domestic takings rule. That was his decision on the other artwork. By the other, you mean the architect? The architect, correct. Yes. He had that letter that I was talking with counsel about, and I was just asking about the painting. You don't have any evidence inside of you? There was evidence. I don't have it all in front of me, but if you look at his decision on in the studio, there was evidence that it had passed into Hungarian state ownership and was covered by the 1973 agreement. One of the documents I know he relied upon was the 1959 claim made by the owner of the artwork. I don't have in front of me anything else he relied on, but it would be in the record and in his decision. Well, I think Judge Hubell left it open. It wasn't clear. In any event, you don't have any new record evidence. Thank you. On the issue of forum non-convenience, Judge Bates gave the plaintiffs the correct amount of difference, acknowledged that plaintiffs have the right to pick their forum, but agreed that it was not the same difference that he provided to an American plaintiff. These are now foreign plaintiffs. If we're only talking about the Santa Barbara Sculpture, these are now two foreign plaintiffs. There's no connection with the artwork in the United States. Well, plaintiff's forum is not an irrelevant factor, even where a plaintiff is not an American citizen or a forum, lives in Italy. Correct. It's not irrelevant. Judge didn't mention that, other than that's their age. It's not irrelevant, but it's given different weight when you're comparing. It's still a factor. It is still a factor. The judge considered it, and then he walked through all of the public and private factors, explaining that they are in Italy, which is not more convenient to the United States than it is to Budapest, that there will be issues of international law, that there will be additional expert facts that will need to be resolved. That's his opinion. Coming to the United States may be much more convenient than going to the United States. All kinds of things. I don't know. There's no evidence. No, but I'm just getting at how he interprets that. This court gives him substantial deference when he works through a reasoned analysis of the factors, looks at the evidence and the arguments put forward, and found that all 10 factors, public and private, weigh in favor of convenience in Hungary over convenience in the United States, for the reasons he explained, and which are, again, given substantial deference. I don't think it was just a few of the factors. He went through all of them. Issues of what law will be applied, what additional translations will be needed, what expert testimony will be needed on how those laws are to be interpreted, use of Hungarian attorneys in the proceedings. Those were all considered by him, in addition to the geographic proxies. I assume if we thought that the art that had... Elizabeth's artwork is back in play in the case, that we should just remand the form of nonconvenience issue to the district court to consider. Yeah, that was... I mean, I assume that it was a prior form of nonconvenience analysis earlier in the case that held that because of American... Yes, yes. If the 27 artworks, the situation changes from how it is right now, and those are back in the case, then yes, the form of nonconvenience argument changes too. And just going back to the wartime takings issue, are there any takings that occur during wartime that legitimately fall under the expropriation exception post the Supreme Court's decision in Phillips? If you look at the restatement, no. The restatement says that these sections, which detail the law of expropriation, do not apply in the time of war. It seems odd. I mean, we've had dozens and dozens of cases and myriad opinions that assume the contrary. I don't mean... And it just feels like a rash move to say they were all operating under a categorical misapprehension of the field of law that applies. I don't think you need to get to that question. I think you can affirm on other grounds. But when you look at how the law expropriation was developed, it was a law to protect property of aliens, property of other people coming into a host country. And it regulated what that host country could do and when they would be responsible for harm to that property. So the dynamic, like the classic was in Sabatino, where you have Cuba nationalizing property belonging to Americans, the properties located in Cuba. So you have not only in the introduction to the restatement part four, you have the language that this does not apply in times of war. It's meant to apply in times of peace. It also talks about a state's jurisdiction. This is meant to regulate a state's conduct within its jurisdiction. And so whether or not it is a categorical, it can never apply in the time of war. I agree, no court has looked at that. Judge Bates acknowledged war rages differently at different places at different times. Whether or not you would find a state of war inside of a country that is taking property from its own people, whether it would apply in a situation like Austria that was annexed, was there active war going? I think there are nuanced issues that need to be resolved to say something categorically like that. But here you have German troops arguably being held responsible, Germany being held responsible for its wartime conduct in allegedly occupying Hungary. This is squarely within the rules of war. They've cited the Hay Conflict and the Law of War. Those are not issues you see in the law of expropriation, which deals with... So you're not just talking about the Santa Barbara now, or are you? No, I was just responding to your question about we haven't seen this in other cases and then... But so if you're not proposing that we do something different from what Judge Bates did and apply the limitations of the restatement and of international law to peacetime in the other cases, in the other appeal, I know it's on one case, but in the other appeal as that was instead of doing what reviewing the grounds on which Judge Bates decided. I think you could go in that direction if you were interested in doing that. What we briefed for Judge Bates on, we'll call it the 27, was squarely under Philip, the domestic takings. That the plaintiff had alleged throughout this case, Hungary was responsible for taking these artworks and pursuant to Philip and this court later in Simon, that did not amount to a taking in violation of international law because they were Hungarian citizens. So the domestic takings rule applied. And then we dealt with the de facto statements argument. The most efficient way to deal with, well, I'll call it the chapel two, which is what we're talking about now, is we don't even have to address the wartime taking issue if we just rule on form non-convenience. Correct. You don't need to address the wartime taking issue on the 27 or on the Santa Barbara. Correct. And is there no weight given in the form non-convenience analysis to the fact that DC District Court has had jurisdiction over this case for many, many years and put a lot of work into it, as have parties, and because at a late stage certain plaintiffs are eliminated, the whole thing starts over again somewhere else? I don't think it starts over again someplace else. Fact discovery has been conceded, so they wouldn't have to restart every piece of the litigation. The Hungarian courts could certainly make their own determinations. What we know is in the Hungarian courts, there's no statute of limitations for claims based on wartime takings. There's no question of jurisdiction, and the plaintiffs have due process rights. And we did have litigation in the 2000s where part of the Dischapel family, the Herzog family, participated, but not all of them. The two Italian sisters, in fact, chose not to participate. And so they would not participate or provide documentation. So how that litigation might turn out, I don't think we can predict or say, but it is an adequate form in that it provides courthouse for the plaintiffs to file their claim. To your question... I'm just saying that I haven't been on these cases, but in a usual form, not, you know, the case would be here, it would be in Italy. The law of Italy has been steady. We haven't had the convulsion of a world war. What's going on in Hungary now is different than what happened some 15 years ago. That's all I'm getting. Okay. As far as... Even though they've been waiting in good faith and litigating here for 15 years, they have to go to another jurisdiction, new filing processes, new fees to pay, new motions. Well, we're not ready for trial tomorrow in this case either, Your Honor. We still have to determine choice of law. We still have to go through expert discovery. There's a significant amount of work, which I think the plaintiffs acknowledged before this is trial ready. That also has to be done in Hungary. As I understand it. We don't know. So the Santa Barbara sculpture, that's the only thing that was the subject of the form correct ruling. But if we dismiss as to the other 27, I guess it's maybe a question for the other side. Did they bring actions in Hungary then? On the 27? Yes. I'm not an expert on Hungarian law and whether res judicata or collateral estoppel would be available to them, but there would be some ruling on the merits that could be argued. I can't say that. So the cause of action would be the same, it would be under international law in Hungary or is it something different? It would be the same theory that the part of the family brought with regard to other artworks in 2000, that they were wrongfully taken and that they should be returned. But that was a 27 part of that. No, that was part of prior briefing in this case. Some of them overlapped, but those were resolved through prior motions. Okay. All right. Okay. And I think, Ms. Berenati, you have one more rebuttal. I want to thank you all for the time and dedication that this court has shown to this not just today, but over the past decade and a half. It's been a journey. I just want to note that both this court on a prior appeal and the district court have found that plaintiffs would likely have no opportunity to receive the relief that they seek if the suit were dismissed on grounds of forum non. And as we say in our papers, I don't think the fact that we're down to the one should change that prior analysis. So, isn't it true that if we dismiss that to the 27, there's no recourse anywhere else? You couldn't bring or even try to bring? You can try, perhaps. Like Mr. Bryan, I'm not an expert on Hungarian law. My understanding is that the special procedures that were sort of in place that might have made it easier to bring a claim at one point in time in the course of this litigation no longer exists. So, you're back to where the family tried and failed in the 90s to have these claims adjudicated in the Hungarian courts. What's possible today, we would have to see. But I don't think it's defendant's burden to prove that Hungary is an adequate forum, not our burden to show that it's not. And I don't think they met that burden here. So, I just want to leave one final point, which kind of goes back on the occupation issue we were talking about, is that Hungary's own constitution states that Hungary lost its self-determination during the period at issue. They put that in their recent constitution, not some historical artifact. So, I think for them to now come into court and say that these are all domestic matters, we're insulated, or it's wartime and you can't look at it, is at odds with this idea that what they have represented in their own constitution. Thank you again very much. Unless the court has further questions, I'll rest. Thank you. Thank you. Submit it. Thank you.
judges: Pillard; Pan; Rogers